## In re CHIN AH SOOEY.

*(District Court, D. California. August 21, 1884.)*

CHINESE IMMIGRATION—ACTS OF 1882 AND 1884—POWER OF COURT TO ORDER REMOVAL OF CHINAMAN FROM COUNTY.

Where a Chinese person has, on proceeding by *habeas corpus*, or by a justice, judge, or commissioner, been found to be unlawfully within the United States, and the vessel from which he was taken has sailed, the court may direct the marshal, to whose custody such person has been remanded, to cause him to be removed to the country whence he came.

*Habeas Corpus.*

In this case the petitioner, a Chinaman, had, by the judgment of the court in a proceeding of *habeas corpus*, been remanded to the custody from which he was taken. The marshal thereupon made return that the ship from on board which he was taken had sailed, and that it was therefore impossible to execute the order of the court. An order was thereupon entered committing the petitioner to the custody of the marshal to await the direction of the president for his removal, or the further order of the court. Under the act of 1884 the directions of the president are no longer required. The assistant United States attorney moved that an order or writ be directed to the marshal, commanding him to cause the petitioner to be removed to the country whence he came.

*S. G. Hilborn*, U. S. Atty., and *Carroll Cook*, Asst. U. S. Atty., for the United States.

*A. P. Van Duzer*, for petitioner.

HOFFMAN, J. Neither the act of 1882 nor the recent act of 1884 makes any specific provision for the disposition to be made of Chinese persons found on a proceeding by *habeas corpus*, or by "a justice, judge, or commissioner," to be unlawfully within the United States. That any human being claiming to be unlawfully restrained of his liberty has a right to demand a judicial investigation into the lawfulness of his imprisonment, is not questioned by any one who knows by what constitutional and legal methods the right of liberty is secured and enforced by at least all English-speaking peoples. In many of the states the refusal on the part of the court or judge to grant the writ of *habeas corpus*, on a proper showing, is punished as a misdemeanor. When, therefore, Chinese in large numbers arrived at this port, who were detained on board the ship by the master, at the instance of the customs-house authorities, their right to demand the judgment of the court whether they were lawfully restrained of their liberty could not

be gainsaid.   Writs of *habeas corpus* were accordingly issued in hundreds of instances.   The ordinary course in such cases is either to discharge the petitioner, or to remand him to the custody from which he was taken, when such custody is found to be lawful.   It soon became apparent that the latter course, owing to the number of cases, was impracticable; for the ship would, in the ordinary course of her trade, have departed long before the petitions could be heard.   The suggestion by the district attorney that "the ship should be detained," was, of course, rejected:   *First*, because the restriction act conferred no such power on the court; and, *secondly*, because it could not have been contemplated by congress that the traffic of a great line of steamers should be interrupted, the intercourse between this city and the ports of China and Japan be suspended, and the mail service be obstructed, because it was alleged that some of the passengers on her inward-bound voyage were not entitled to land,—passengers who had been admitted on board on presentation of certificates which the law declared to be *prima facie* evidence of their right to enter the United States.

When, therefore, it appeared by the return of the marshal that he was unable to execute the order to remand the petitioner, the embarrassing question presented itself, what was to be done with him?   The twelfth section of the act provided that "any Chinese person found unlawfully within the United States shall be caused to be removed to the country wrom whence he came, *by direction of the president of the United States*, and at the cost of the United States, after being brought before some justice, judge, or commissioner of a court of the United States, and found to be one not lawfully entitled to be or remain within the United States."   It will be observed that this section does not confer, in express terms, any power on the justice, judge, or commissioner to issue any warrant or other order for the purpose of causing the person accused of being unlawfully within the United States to be brought before him.   We thought, however, that the power might be implied from the provisions of the act, and from the general powers conferred on those officers to inquire into alleged offenses against the laws of the United States.   A more serious difficulty arose from the entire omission in the section of any clause conferring power on the justice, judge, or commissioner to make any order for the removal of the offender to the country whence he came, or indicating to whom such order should be directed, or by whom executed.   Here, again, we were obliged, in order thus to save the law from total failure, to hold that the justice, judge, or commissioner might, on finding the person brought before him "not to be lawfully within the United States," make an order committing him to the custody of the marshal, to await "the direction" of the president.   We were at first disposed to think that this proceeding before a justice, judge, or commissioner was indispensable.   Had we so held, a double investigation would in all cases have been necessary; it might be, before the

same judge who had heard the case on the return of the writ of *habeas corpus.* We therefore held, though not without some doubt, that the finding of the court in the *habeas corpus* proceeding might be taken as, or as the equivalent of, a finding by a justice, judge, or commissioner, mentioned in the twelfth section of the act.

In the recent amended act of 1884, the words "by direction of the president of the United States" are omitted. But the act, like the law of 1882, fails to confer on any tribunal or officer authority to cause the person unlawfully here to be removed to the country whence he came. Neither does it indicate by whom the removal is to be effected. As the amended act withdrew from the president the authority to direct the removal, the order of commitment could no longer command the marshal to hold the prisoner to await his direction. To keep the "Chinese person" in prison or on bail for an indefinite period was out of the question. To discharge him would be to render the act wholly abortive, except as to those persons whose cases might be heard in time to remand them to the ship on which they came. Under these circumstances, and to prevent the almost entire collapse of the law, we, with some hesitation, held that the court might issue an order to the marshal commanding him in effect to cause the person found to be unlawfully here to be removed to the country whence he came. We are aware that the act does not in terms confer on us any authority to pass and cause to be executed a sentence of deportation on Chinese persons. But, unless the act be construed as impliedly giving us that authority, it would prove utterly abortive as a means of attaining the object which congress had in view. The construction we have given may seem to many, perhaps not unjustly, latitudinarian, and savoring of judicial legislation. It has appeared to us unavoidable, *ut res magis valeat quam pereat.*

The foregoing will convey an idea of the embarrassing nature of some of the numerous questions which arise under the restriction acts. It also serves to show what has been the justice of the reproaches so freely cast upon the courts, that they have been, from some inconceivable motive, engaged in a persistent effort to defeat on technical grounds the operations of the law.

The motion of the district attorney is granted.